IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 22-291 |
| | : | |
| TAHAR SOLTANI | : | |

## MEMORANDUM

**Judge Juan R. Sánchez**                                         **March 13, 2025**

On September 7, 2022, Defendant Tahar Soltani was indicted on two counts of possession

of a firearm by a felon under 18 U.S.C. § 922(g)(1), stemming from car stops on February 7, 2021

(Count One) and May 6, 2022 (Count Two). Soltani has moved to suppress the firearms recovered

from the car stops and the video confession made to police officers on February 8, 2021. He argues

the car stops were unlawful and the confession was the product of coercion. Because the stops

were lawful and the confession was voluntary, the motion to suppress will be denied.

**FINDINGS OF FACT[1]**

1. On February 7, 2021, Sergeant Timothy Fletcher[2] of the Delaware River Port Authority

   (DRPA) was on duty driving westbound on the Pennsylvania side of the Walt Whitman

   Bridge at approximately 50-55 miles per hour. Tr. Suppress Hr'g 12/16/24, 39:17-40:12,

   ECF No. 72. As Sergeant Fletcher approached the toll plaza, he observed a white SUV—

   later determined to be operated by Defendant Tahar Soltani—overtake all other vehicles

---

[1]     The following factual findings are based on the evidence presented at the suppression
hearings on December 16, 2024 and January 15, 2025, including: (1) testimony from Seargent
Timothy Fletcher, Detective Jonathan Ruth, Detective Robert Lamanna, Detective Christopher
Clair, Detective Thomas D'Alesio, Officer Chanta Ung, Officer Tyler Kriebel, and Soltani; (2)
video footage from body-worn, surveillance, and dash cameras; (3) audio recording of a police
radio call; and (4) law enforcement paperwork, including a signed waiver of rights form.

[2]     Seargent Fletcher held the rank of "Acting Corporal" on February 7, 2021.

including his own. *Id*. at 40:13-21; Toll Camera Video, Gov't Ex. 1a. Seargent Fletcher also observed the SUV cut off another car before entering the toll booth.[3] Tr. Suppress Hr'g 12/16/24, 41:2-9.

2. Based on his observations, Seargent Fletcher pulled the SUV over for careless driving, a traffic offense in Pennsylvania.[4] *Id*. at 41:10-24. He waited for the SUV to exit the toll plaza and followed it to an off-ramp before activating his overhead lights around 10:29 p.m. *Id*. at 46:16-20, 51:4-12. After a few seconds, the SUV pulled over to the right shoulder and the driver, Soltani, immediately opened the driver's side door, getting tangled up in his seatbelt in the process. *Id*. at 53:5-23; DRPA Dash Cam Video, Gov't Ex. 2. By 10:30:25 p.m., he quickly disentangled from the seatbelt, ran across the I-95 highway off-ramp, and climbed a chain-link fence into the back of Whitman Plaza. DRPA Dash Cam Video, Gov't Ex. 2. Seargent Fletcher attempted to follow but quickly lost sight of him. Tr. Suppress Hr'g 12/16/24, 28:10-15.

3. As Soltani ran, he repeatedly grabbed his waistband. Based on Seargent Fletcher's experience carrying firearms in his own waistband and locating firearms in people's waistbands, he believed Soltani was carrying a firearm. *Id*. at 55:3-56:16. Seargent Fletcher radioed for assistance to locate Soltani. He went back to the SUV and confiscated the keys and phone in the SUV. *Id*. at 58:17-59:1. He then drove around the Whitman Plaza to try to locate Soltani.

---

[3] At the suppression hearing, Soltani admitted to passing the cars and cutting off a car before entering the toll booth. Tr. Suppress Hr'g 1/15/25, 11:1-12:17, ECF No. 81.

[4] "Any person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense." 75 Pa. C.S. §3714(a).

4.   After driving around for a few minutes, Seargent Fletcher was approached by a civilian around 10:40 p.m. The civilian indicated the person Seargent Fletcher was looking for put a firearm into a trash can. The civilian led Seargent Fletcher to a trash can outside ShopRite in the Whitman Plaza. Seargent Fletcher subsequently recovered a black firearm inside the trash can. *Id*. at 62:14-63:18; DRPA Dash Cam Video, Gov't Ex. 2.

5.   Surveillance video from ShopRite captured Soltani drop the firearm into the trash can around 10:31:38 p.m. and the civilian walk up to the trash can at 10:31:50 p.m. as Soltani walked off. The video also showed Seargent Fletcher recover the firearm at 10:43 p.m and Soltani come back to the trash can around 11:22 p.m. to look for the firearm. ShopRite Video, Gov't Exs. 3a and 3b.

6.   Before he drove around the Whitman Plaza to locate Soltani, Seargent Fletcher ran the registration of the SUV and determined it was registered to a Tahar Soltani at 1421 S. 9th Street in Philadelphia. After recovering the firearm, Seargent Fletcher went to the address with other officers and knocked on the door, but no one answered. Seargent Fletcher then dropped off the firearm at the Philadelphia Police Department's (PPD) South Detectives Office.[5] Tr. Suppress Hr'g 12/16/24, 88:2-89:2.

7.   The next morning, at around 10:35 a.m., Soltani's mother went to pick up the SUV but was told by DRPA Officer Romano that Soltani needed to come because the car was registered in his name. Soltani went to the DRPA office that morning. Detective Jonathan Ruth of the South Detectives Office directed DRPA officers to bring Soltani to the South Detectives Office. *Id*. at 90:14-91:13, 127:4-15. Soltani was handcuffed and transported from the

---

[5]      Seargent Fletcher's testimony was corroborated by surveillance camera footage from the Walt Whitman Bridge and ShopRite, as well as his dash camera footage. Accordingly, the Court finds Seargent Fletcher's testimony credible in all respects.

DRPA office at 11:06 a.m. The drive from the DRPA office to the South Detectives Office

was about 10 to 15 minutes, so Soltani arrived at 11:16 a.m. at the earliest. *Id*. at 128:6-

130:13, 159:17-18.

8.  When Soltani arrived at the South Detectives Office, he was brought to the second floor

and placed in a holding room about three feet across from the video interrogation room. He

was searched for weapons by Detectives Ruth and Daniel Duffy. *Id*. at 131:3-132:2. While

in the holding room, Detective Ruth explained to Soltani why he was brought to the South

Detectives Office, told him about the ShopRite surveillance camera footage, and explained

he was not under arrest and had no pending charges against him. Detective Ruth also

explained the PPD's COVID arrest and charging process—which, based on a directive

from the District Attorney's Office (DAO), often required officers to release suspects after

charging them and obtaining a warrant for their arrest later. *Id*. at 132:7-133:22, 166:15-

168:20. Detective Ruth asked Soltani if he wanted to be truthful, and Soltani indicated that

he did. Detective Ruth then explained the *Miranda* waiver and video recording process to

Soltani, but Soltani did not confess in the holding room. Detective Ruth left to print out the

*Miranda* waiver form and Detective Duffy left to turn on the video recording equipment.[6]

*Id*. at 133:23-134:15.

---

[6]     Soltani's version of events differs. For reasons stated below, the Court does not find his
version credible. Initially, Soltani alleged he was in the holding room for "approximately 45
minutes" before being moved to the interrogation room by Detectives Ruth and Duffy. 2021 Mot.
Suppress 3-4, ECF No. 43. Soltani claims that while in the interrogation room, the detectives
coerced a confession without advising him of his *Miranda* rights and then moved him to a different
interrogation room to record the video. *Id*. As will be explained later, Soltani could not have been
in the holding room for more than ten minutes. The earliest he could have arrived at the South
Detectives Office was 11:16 a.m., and he was seen on camera entering the interrogation room from
the holding room at 11:26 a.m. When confronted with this inconsistency at the suppression
hearing, Soltani stated "I might have got the times wrong. This was four years ago." Tr. Suppress
Hr'g 1/15/25, 32:10-11, ECF No. 81.

9.  At 11:23:37 a.m., the video recording started in the interrogation room. There was no audible noise until 11:26:10 a.m., when the door to the interrogation room opened. Detective Ruth walked in three seconds later and placed the *Miranda* waiver forms on the desk and exited. At 11:26:23, the door to the holding room opened and Detective Ruth is heard asking Soltani how to pronounce his name. Ten seconds later, Detective Ruth walked Soltani into the video interrogation room, with Detective Duffy following shortly thereafter. Soltani Video Statement, Gov't Ex. 5.

10. Detective Ruth then read the first page of the *Miranda* form to Soltani, who verbally acknowledged Detective Ruth's summary of his *Miranda* rights and signed the first page of the form. Detective Ruth then read the second page of the form to Soltani, who again verbally acknowledged Detective Ruth's reading and completed and signed the second page. Signed Waiver Form, Gov't Ex. 6. Soltani then confirmed Detective Ruth did not threaten him nor promise him anything for his statement. Tr. Suppress Hr'g 12/16/24, 141:11-144:3.

11. From 11:30:24 to 11:36:22 a.m., Soltani confessed to driving the Lexus SUV, being pulled over, running from police, climbing the fence, tossing the firearm in the ShopRite trash can, and returning to look for it. After the confession, Soltani asked about next steps ("Yeah. So, I'm being honest with y'all, so be honest with me. So, what's the next step? Like, is it what you told me?"). Tr. Soltani Video Statement 8, Gov't Ex. 7. Detective Ruth

---

The Court finds Soltani's version is not credible because of (1) the significant inconsistencies in his initial pleading and his testimony at the suppression hearing; (2) his demeanor on the stand—Soltani did not come across as sincere or trustworthy; and (3) his criminal history of crimes involving deceit. Further, Detective Ruth testified that, consistent with his practice, if Soltani confessed before being Mirandized, he would have documented it in his police investigative report, informed the DAO, and discussed it during the video statement. Tr. Suppress Hr'g 12/16/24, 189:13-190:6.

then explained the COVID arrest and charging process to Soltani again. Detective Ruth indicated there were no pending charges against Soltani, and he had to review the evidence with the DAO to determine whether Soltani would be charged. Soltani, Detective Ruth, and Detective Duffy all left the interrogation room at 11:42:55 a.m. The video recording ended at 11:43:39 a.m. Tr. Suppress Hr'g 12/16/24, 148:14-149:24; Gov't Exs. 5, 7.

12. After the video statement, Detective Ruth reviewed the evidence with the DAO and was directed to charge Soltani. Detective Ruth subsequently charged and arrested Soltani. Tr. Suppress Hr'g 12/16/24, 152:10-153:9.[7]

13. On May 5, 2022, Detective Christopher Clair of the PPD's Shooting Investigation Group (SIG) was assigned to a non-fatal shooting near the intersection of 62nd Street and Kingsessing Avenue in Southwest Philadelphia. As part of his investigation, Detective Clair reviewed surveillance video (Kingsessing Surveillance Video, Gov't Ex. 9), flash information from civilians, and eyewitness testimony. Based on this review, Detective Clair believed the shooter to be Soltani and identified the vehicle to be a black Dodge Avenger with a possible license plate including the letters "LM" and the numbers "41." *Id*. at 220:22-225:14. Further, Detective Clair discussed the shooting with his partner, Detective D'Alesio, who indicated that Soltani appeared to be the suspect in a May 2, 2022 shooting to which he was assigned. The May 2 shooting took place around 1100 Mifflin Street in South Philadelphia. Detective Clair also reviewed footage of this shooting, which involved a similar black Dodge Avenger and a person who appeared to be Soltani. Mifflin

---

[7]     Detective Ruth's testimony was corroborated by the video statement, signed waiver form, and police investigative reports. Accordingly, the Court finds his testimony credible in all respects.

Surveillance Video, Gov't Exs. 8a and 8b. The victim in that case identified Soltani and

indicated he drove a black sedan.[8] *Id*. at 233:23-237:18.

14. Detective Clair then collaborated with other officers to determine the model of the car was

between 2008 and 2014 with a possible PA license plate of "LNW-3141." Detective Clair

then generated a patrol alert with the following: "2008-2014 (black) Dodge Avenger,

possible PA tag of LNW-3141. There are several dings and dents to the hood and damage

to the front passenger side quarter panel of this vehicle. The vehicle is also equipped with

a sunroof and an antenna on the rear of the roof." Patrol Alert, Gov't Ex. 17; Tr. Suppress

Hr'g 12/16/24, 238:12-242:24. The patrol alert stated the vehicle was involved in a

shooting on May 5, 2022, and included screenshots of the vehicle from the scene of the

shooting. It also included that it was "for identification purposes only" and officers were

to use caution because the "subject was considered armed and dangerous." Gov't Ex. 17.

The alert was disseminated to police officers across the city via email at approximately

8:45 p.m. on May 5, 2022. The patrol alert did not include any information about Soltani.

According to Detective Clair, the purpose of the patrol alert was officer safety, and at the

---

[8]    During the course of their investigations into the May 2nd and 5th shootings, Detectives
Clair and D'Alesio received some information that did not match Soltani and the black Dodge
Avenger. For example, Detective Clair received flash information from civilians that included a
description of two white male shooters and a red Dodge Charger, and an eyewitness failed to
identify anyone in a subsequent photo array. Tr. Suppress Hr'g 12/16/24, 247:11-250:19.
However, the surveillance video, which Detective Clair also reviewed, implicated Soltani and the
black Dodge Avenger. *Id*. at 260:9-10; 264:21-266:20. Regarding the May 2nd shooting, the
victim's description included a tear drop tattoo, which does not match Soltani. However, the
victim's other descriptions matched Soltani: "White or Hispanic male, approximately thirty-six
years old, five foot eight, muscular build, teardrop tattoo near his eye. Male was wearing a white
beanie and goes by the name T." Further, the victim gave Soltani's address and identified him by
photo. Tr. Suppress Hr'g 1/15/25, 44:4-9.

time of the patrol alert, he had not yet conclusively determined Soltani was involved. Tr. Suppress Hr'g 12/16/24, 244:7-21.

15. In the morning of May 6, 2022, Detective Robert Lamanna,[9] who received the patrol alert the night before, began to investigate the whereabouts of the black Dodge Avenger using the patrol alert and PPD's Automatic License Plate Reader (LPR) System—which determines prior locations of vehicles using cameras. *Id*. at 272:8-273:25. Using the LPR System, Detective Lamanna received numerous hits, including recent hits in South Philadelphia. While on duty in his personal car, Detective Lamanna drove around South Philadelphia looking for the car. Around 3:00 p.m., he located the black Dodge Avenger with a license plate of LNW-3141, parked and unoccupied, near 6th and Jackson Streets. *Id*. at 275:3-279-11. He then called Detective Clair to determine how to proceed. Detective Clair, who was at a wedding at the time, directed Detective Lamanna to call Detective D'Alesio. *Id*. at 245:2-10; 284:7-11. Detective D'Alesio informed Detective Lamanna the black Dodge Avenger was involved in multiple shootings and he preferred the vehicle be stopped while occupied to get the identity of the driver, but he was also fine with an unoccupied recovery of the vehicle. *Id*. at 311:15-312:9; Tr. Suppress Hr'g 1/15/25, 52:20-53:15, ECF No. 81.

16. Around 3:29 p.m., Detective Lamanna called the Captain of PPD's 3rd District for personnel assistance and relayed the information about the vehicle being involved in multiple shootings. While waiting for assistance, Detective Lamanna observed a male enter the driver's side of the black Dodge Avenger. The Dodge Avenger started moving, but Detective Lamanna was unable to follow due to traffic conditions. Instead, he called the

---

[9]    Detective Lamanna held the rank of "Officer" on May 6, 2022.

police radio and advised the vehicle was occupied and in motion.[10] On that call, the Captain

of PPD's 3rd District asked for confirmation the vehicle was involved in multiple shootings,

which Detective Lamanna confirmed.[11] Tr. Suppress Hr'g 12/16/24, 284:16-287:8; Radio

Call Audio, Gov't Ex. 11; Tr. Radio Call, Gov't Ex. 12.

17. Officer Chanta Ung heard the radio call and observed the Dodge Avenger around 5th and

Wolf Streets. Tr. Suppress Hr'g 12/16/24, 328:19-23. Officer Ung followed the car until it

parked around 6th and Hoffman Streets, at which point Officer Ung got out of his vehicle

and approached in an attempt to get the driver, Soltani, out of the vehicle. Officer Ung

grabbed Soltani's arm as Soltani was getting out of the driver's seat. Soltani then ripped

away and started running westbound on Hoffman Street. Officer Ung immediately began

---

[10]     On the radio call, Detective Lamanna stated the suspected driver was a Black male and did not identify the passenger. Radio Call Audio, Gov't Ex. 11; Tr. Radio Call, Gov't Ex. 12. At the suppression hearing, Detective Lamanna stated that, due to the angle of his car, he only got a quick glance "over [his] shoulder through the rear window of [his vehicle]." Tr. Suppress Hr'g 12/16/24, 295:18-23. Further, it was raining and the suspected driver had his hood up. *Id*.

[11]     Detective Lamanna's testimony is corroborated by Real Time Crime Camera Video showing Soltani get into the black Dodge Avenger (Gov't Ex. 10), audio of the police radio call, and testimonies of Detectives Clair and D'Alesio. The Court finds his testimony credible.

Defense, however, challenges Detective Lamanna's credibility based on a previous PPD Internal Affairs' investigation regarding Detective Lamanna. The Court finds the investigation finding does not impact Detective Lamanna's credibility in this case because the underlying facts are different, Detective Lamanna did not initiate the stop here, and his testimony is corroborated by the evidence. Nonetheless, the Court will allow the following Defense's proffer about the investigation on the record: "Philadelphia Police Department Internal Affairs Division found that Detective Lamanna on June 26, 2023, conducted an improper stop/detention without reasonable suspicion of a crime or other violation.  Specifically, the Internal Affairs investigation found that Officer Lamanna—who was assigned to the 18th District—utilized the Real Time Camera Center to initiate a pedestrian stop despite the fact that he lacked any knowledge of the investigation being conducted by police officers from the 12th District. The complaint against Officer Lamanna was sustained and he was found to be in violation of department policy. This finding by the Internal Affairs Division is extremely relevant to the present case where Officer Lamanna is alleged to have initiated the stop of the defendant based on an investigation being conducted by other officers that he was not involved in." Def.'s Letter Br., ECF No. 75.

to chase Soltani and repeatedly shouted "let me see your hands" because he observed
Soltani reaching for the waistband. While in pursuit, Officer Ung radioed for assistance
and relayed Soltani was reaching for his waistband. Officer Ung chased Soltani, who failed
to comply with any orders, for about four to five blocks until Officer Ung started to slow
down.[12] *Id*. at 331:12-339:13; Officer Ung Body Camera, Gov't Ex. 13.

18. Officer Tyler Kriebel, who heard Detective Lamanna and Officer Ung's radio calls,
   responded to Officer Ung's call for assistance. Tr. Suppress Hr'g 12/16/24, 367:16-368:5.
   Officer Kriebel spotted Soltani, again reaching for his waistband, around 7th and McKean
   Streets. *Id*. at 370:19-375:17. Officer Kriebel jumped out of his car and ordered Soltani to
   the ground. Soltani slowed down, and Officer Kriebel forced him to the ground and
   handcuffed him for a pat-down. Officer Kriebel patted Soltani's waistband area and felt an
   object in Soltani's left pant pocket he recognized as a firearm magazine. Officer Kriebel
   removed the object, and it was a loaded magazine with thirteen rounds of ammunition.
   Officer Kriebel then stood Soltani up and asked another officer to pat Soltani down for a
   firearm as he traced Soltani's flight path to see if Soltani tossed a firearm. After less than
   a minute, the backup officer called Officer Kriebel, alerting him of an object in the ankle
   area of Soltani's jeans. Officer Kriebel felt the object and recognized it as a firearm. *Id*. at
   378:16-385:13; Officer Kriebel Body Camera, Gov't Ex. 14. Officer Kriebel retrieved the
   firearm and obtained Soltani's name. Officer Kriebel then ran the name through PPD's
   computer database to determine if Soltani had a permit to carry a firearm. The database

---

[12]    Officer Ung's testimony is corroborated by body camera footage and audio of the police
radio call. Accordingly, the Court finds his testimony credible in all respects.

showed Soltani did not have a permit, and Officer Kriebel arrested Soltani.[13] Tr. Suppress Hr'g 12/16/24, 386:18-387:19.

**LEGAL STANDARDS**

Concerning the car stops, the Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (internal quotation marks and citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 22-24 (1968). Such brief investigatory stops (*Terry* stops)—including traffic stops—are considered seizures for purposes of the Fourth Amendment. *Delfin-Colina*, 464 F.3d at 396. Reasonable, articulable suspicion means "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. This standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  In determining whether reasonable, articulable suspicion exists for a *Terry* stop, courts must consider the "totality of the circumstances." *Delfin-Colina*, 464 F.3d at 397.

If a *Terry* stop is "conducted without reasonable suspicion of criminal activity, any evidence obtained must be suppressed as fruit of the poisonous tree." *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023) (internal quotation marks and citation omitted). However, reasonable suspicion is only required if an individual is seized, and there is no seizure if the individual does not submit to the officer's show of authority. *United States v. Valentine*, 232 F.3d 350, 358 (3d

---

[13]    Officer Kriebel's testimony is corroborated by body camera footage. Accordingly, the Court finds his testimony credible in all respects.

Cir. 2000) (holding "if the police make a show of authority and the suspect does not submit, there is no seizure."); *Amos*, 88 F.4th at 455. Momentary compliance with an officer's show of authority is not sufficient submission for a seizure. *United States v. Richardson*, 504 F. App'x 176, 182 (3d Cir. 2012) (holding "momentary compliance does not amount to submission to a seizure."). However, "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," is a seizure. *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (internal quotation marks and citation omitted).

"During the course of a Terry stop, reasonable suspicion can escalate to probable cause, justifying an arrest." *United States v. Pitts*, 497 F. App'x 252, 254 (3d Cir. 2012). "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (internal quotation marks and citation omitted).

Concerning the video confession, a defendant must be warned of his right against self-incrimination and his right to an attorney before he can be subjected to custodial interrogation by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation occurs when law enforcement questions a defendant after he "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444). Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id*. at 301. A statement related to "police's administrative" or processing

concerns is not interrogation. *Maryland v. King*, 569 U.S. 435, 456 (2013); *see also United States v. Christian*, 281 F. App'x 116, 118-19 (3d Cir. 2008).

A defendant may waive his *Miranda* rights if waiver is knowingly, intelligently, and voluntarily made. *Miranda*, 384 U.S. at 444. A waiver is voluntary, knowing, and intelligent if it is the "product of a free and deliberate choice rather than intimidation, coercion, or deception" and is "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (internal quotation marks and citation omitted). The government has the burden of proving waiver by a preponderance of the evidence. *United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989). Courts assess the validity of a waiver by looking "at the facts of the particular case, including the background, experience, and conduct of the suspect," as well as prior dealings with the criminal justice system. *Id.*; *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). "An express written or oral statement of waiver … is usually strong proof of the validity of [a defendant's] waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

Where a two-step interrogation is at issue—meaning the defendant makes an inculpatory statement prior to being given *Miranda* warnings and subsequently repeats the statement after being given *Miranda* warnings—the admissibility of the post-*Miranda* statement "should turn … solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). Courts must "examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id*. at 318. "Absent deliberate coercion or improper tactics in obtaining an unwarned statement, a careful and thorough administration of *Miranda* warnings cures" the post-*Miranda* statement. *Reinert v. Larkins*, 379 F.3d 76, 90 (3d Cir. 2004) (citing *Elstad*, 470 U.S. at 311-12). To determine

13

deliberateness of a two-step interrogation strategy, courts review the "the totality of the objective and subjective evidence surrounding the interrogations." *Charleston v. Gilmore*, 305 F. Supp. 3d 612, 627 (E.D. Pa. 2018) (internal quotation marks and citation omitted).

**DISCUSSION**

Soltani moves to suppress the (1) firearm recovered from the February 7, 2021 car stop, (2) video confession taken on February 8, 2021 relating to that car stop, and (3) firearm recovered from the May 6, 2022 car stop. 2021 Mot. Suppress, ECF No. 43; 2022 Mot. Suppress, ECF No. 44. He argues law enforcement lacked reasonable suspicion for both car stops and the video confession was coerced. The government maintains law enforcement had reasonable suspicion to stop Soltani on both occasions and Soltani's confession was voluntarily given after he waived his *Miranda* rights. 2021 Gov't Opp., ECF No. 50; 2022 Gov't Opp., ECF No. 51. Because Seargent Fletcher and Officers Ung and Kriebel had reasonable suspicion to stop Soltani and Soltani voluntarily confessed after he was Mirandized, the motion to suppress will be denied. The Court will take each challenged evidence in turn.

First, Soltani argues the firearm recovered on February 7, 2021 should be suppressed because the car stop leading to the recovery was unlawful. 2021 Mot. Suppress 4, ECF No. 43. He argues Seargent Fletcher lacked reasonable suspicion to initiate the traffic stop. *Id*. As a preliminary matter, Soltani was never seized by Seargent Fletcher, so a finding of reasonable suspicion is not required. Soltani initially complied with Seargent Fletcher by pulling over to the side of the road. Less than 10 seconds after pulling over, Soltani opened his car door, wrangled with his seatbelt, and immediately ran across the highway away from Seargent Fletcher. Soltani then escaped from Seargent Fletcher by climbing a chain-link fence into the Whitman Plaza. While Soltani initially complied with Seargent Fletcher's signal to pull over, he never submitted to

14

Seargent Fletcher's show of authority because he ran away and escaped. *See Richardson*, 504 F. App'x at 182; *Valentine*, 232 F.3d at 358.

Regardless, Seargent Fletcher had reasonable suspicion to stop Soltani. A car stop "may be initiated based on a reasonable suspicion that a traffic violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018). Seargent Fletcher witnessed Soltani speed past him and other cars on the highway before cutting off a car. Seargent Fletcher's account is corroborated by video from the toll plaza and Soltani's own testimony. Based on Soltani's traffic violations, Seargent Fletcher had reasonable suspicion to initiate the car stop.

Second, Soltani argues he was coerced to confess on video on February 8, 2021. The government has shown by a preponderance of the evidence that Soltani voluntarily waived his *Miranda* rights before confessing. In addition to signing a waiver form, Soltani was Mirandized orally on video. The signed and oral waivers happened at the beginning of the recorded interview, so they were "not the product of a lengthy interrogation or sleep deprivation." *See United States v. Kunsman*, 673 F. Supp. 3d 707, 714 (E.D. Pa. 2023). Further, Soltani, who was 37 years old at the time of the video confession, testified that he was familiar with *Miranda* warnings and had a history of interacting with law enforcement. Accordingly, Soltani voluntarily waived his *Miranda* rights before confessing.

Soltani alleges he was subject to a two-step interrogation in violation of *Miranda* rights. 2021 Mot. Suppress 10-21, ECF No. 43. The Court does not find Soltani's testimony that he was subject to a two-step interrogation to be credible. Based on the record and Detective Ruth's credible testimony, Soltani was not interrogated in the holding room but rather informed of the PPD's COVID arrest and charging process. Even if Soltani is believed, his allegations do not taint his voluntary confession. "Absent deliberate coercion or improper tactics in obtaining an unwarned

15

statement, a careful and thorough administration of *Miranda* warnings cures" the post-*Miranda*

statement. *Reinert*, 379 F.3d at 90 (internal quotation marks and citation omitted). A finding of

deliberateness is reserved for systematic use of the two-step interrogation technique. *See Missouri*

*v. Seibert*, 542 U.S. 600, 609-10 (2004) (finding the withholding of *Miranda* warnings was

deliberate after an officer testified that the strategy "was promoted not only by his own department,

but by a national police training organization and other departments in which he had worked.");

*United States v. Shaird*, 463 F. App'x 121, 124 (3d Cir. 2012) ("Critically, he testified that his

[pre-*Miranda*] conversation with the [suspects] in the van was a deliberate strategy to elicit a

confession."). There is nothing in the record to demonstrate a systematic use of the two-step

interrogation technique by Detective Ruth. Once a court determines "there had been no deliberate

attempt to sidestep Miranda …. [the court] must fall back on" the voluntariness of the confession.

*United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006). As discussed earlier, Detective Ruth

carefully administered *Miranda* warnings to Soltani in the form of a signed statement and oral

colloquy, all of which were recorded on video and audio prior to Soltani's confession. The Court

therefore finds Soltani's post-*Miranda* confession was voluntary.

Finally, Soltani argues he was seized by Officer Ung without reasonable suspicion. 2022

Mot. Suppress 5-9, ECF No. 44. The Government asserts Soltani was not seized until he was

ordered to the ground by Officer Kriebel. 2022 Gov't Opp. 21-24, ECF No. 51. The Court finds

Soltani was seized when Officer Ung grabbed his arm. *See California v. Hodari D.*, 499 U.S. 621,

626 (1991) (holding the "word 'seizure' readily bears the meaning of a laying on of hands or

application of physical force to restrain movement, even when it is ultimately unsuccessful.").

Officer Ung, however, had reasonable suspicion for the seizure. At the time of the seizure,

Officer Ung heard and responded to Detective Lamanna's radio call about the Dodge Avenger,

including information the Dodge Avenger was involved in multiple recent shootings. Further, Detective Lamanna's knowledge of the patrol alert is imputed to Officer Ung under the collective knowledge doctrine to determine whether Officer Ung had reasonable suspicion. *See United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010) (finding that under the collective knowledge doctrine, "knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest."). All of this amounts to a "particularized and objective basis for suspecting" Soltani of criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Officer Kriebel also had reasonable suspicion to seize Soltani. Officer Ung and Detective Lamanna's knowledge—the patrol alert, Detective Lamanna's radio call, Officer Ung's radio call, and Officer Ung's unsuccessful stop of the car—is imputed to Officer Kriebel. Further, Officer Kriebel observed Soltani run from Officer Ung and repeatedly reach for his waistband. *See Wardlow*, 528 U.S. at 124 (holding unprovoked flight from lawful stop supported reasonable suspicion that defendant was involved in criminal activity). Both Officers Ung and Kriebel had reasonable suspicion to believe Soltani was armed and dangerous because of his unprovoked flight, constant reaching for his waistband, and the patrol alert. Accordingly, Officer Kriebel had reasonable suspicion to initiate a *Terry* stop and conduct a limited search for weapons. *See United States v. Torrence*, 612 F. App'x 100, 103 (3d Cir. 2015) (holding officers were permitted to conduct a limited search of defendant's person for weapons because "the officers had sufficient cause to believe [the defendant] was armed and dangerous."). Moreover, once Officer Kriebel recovered the loaded magazine and firearm from Soltani and determined Soltani did not have a license to carry in Pennsylvania, Officer Kriebel had probable cause to arrest Soltani. *See United States v. Acosta*, 751 F. App'x 201, 203 (3d Cir. 2018) (finding "officers had the probable cause

17

needed to arrest … [defendant] after finding firearm" because such a "discovery would lead a reasonable officer to think that [the defendant] had committed a crime, perhaps by possessing the firearm illegally or having used it to commit a crime."). Officer Kriebel thus had reasonable suspicion to seize Soltani and probable cause to arrest him.

**CONCLUSIONS OF LAW**

1. The February 7, 2021 stop by Seargent Fletcher was a lawful, investigatory stop.

2. Soltani was not seized by Seargent Fletcher.

3. Soltani abandoned the firearm in the ShopRite trash can.

4. Soltani was not interrogated in the holding room by Detective Ruth on February 8, 2021.

5. Soltani confessed to possessing the firearm after he voluntarily waived his *Miranda* rights.

6. Officer Ung had reasonable suspicion for his seizure of Soltani on May 6, 2022.

7. Officer Kriebel had reasonable suspicion for his seizure and frisk of Soltani on May 6, 2022.

8. Officer Kriebel had probable cause to arrest Soltani on May 6, 2022.

Accordingly, the motion is denied. An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.

18